IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Jesus Castro Romo, | ) | No. 4:12-CV-041-TUC-JAS |
| | ) | |
| Plaintiff, | ) | **Findings of Fact and Conclusions of Law** |
| | ) | |
| vs. | ) | |
| | ) | |
| The United States of America, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **INTRODUCTION**

This case stems from a confrontation between a United States Border Patrol Agent and a Mexican citizen.   Plaintiff Jesus Castro Romo ("Castro") crossed the United States border with a group of undocumented immigrants.   Border Patrol Agents detected the group's presence and dispatched several Agents, including Border Patrol Agent ("BPA") Abel Canales ("Canales") and his partner BPA Tyrell Moss.   The two agents arrived in the vicinity on horseback and split up to cover more ground.   When Canales located the group, Castro fled the area, and Canales pursued.   Because Canales was on horseback, he quickly caught up to Castro.

Here, the parties' testimony diverges.   Castro alleges that Canales was abusive, assaulting him physically with his reins and verbally with words.   According to Castro, he complied with the Agent's orders and asked that Canales stop hitting him with the reins.

When the attacks continued, Castro threatened to run away toward Mexico.   Eventually, Agent Canales shot Castro in his left flank.

The Government paints a different picture of the encounter.   According to Canales, Castro ignored orders to return to the group, defied Canales verbally and physically, and threatened Canales with a rock before beginning a throwing motion which put Canales in fear for his physical safety.

The Government does not dispute that Canales shot Castro, but argues that the shooting was a justified use of force, and, therefore, Castro is not entitled to compensation.

The Court presided over a five-day bench trial from July 21, 2014 to July 25, 2014. The parties then submitted briefing including post-trial memoranda, proposed findings of fact and conclusions of law, and response memoranda.   After reviewing the testimony of the witnesses, the exhibits, the parties' briefs, and pertinent authority, the Court finds in favor of Plaintiff.

### **FINDINGS OF FACT**

#### **The Shooting**

1.   On November 16, 2010, Jesus Castro Romo was among a group of Mexican nationals who crossed into the United States near Walker Canyon, west of Nogales, Arizona.[1]

2.   United States Border Patrol agents conducting surveillance detected the group's movement and located the individuals whom they suspected of crossing without inspection.

3.   Border Patrol Agents Tyrell Moss and Abel Canales, who were on horseback

---

[1]       In making these findings of fact, the Court considered all the various indicia of credibility, including but not limited to: witnesses' opportunity and ability to see and hear events, memory, manner during testimony, interest in the outcome of the case, bias or prejudice, contradictory evidence, and reasonableness of testimony.  *See* Ninth Circuit Model Jury Instructions 1.11.

patrol in the area, rode to the location of the reported sightings.

4.   At a split in the trail, the agents separated and traveled down different paths in pursuit of the group.

5.   Around this time, members of the group spotted other Border Patrol agents and started walking back toward Mexico.

6.   After the group had walked about an hour in that direction, Agent Canales intercepted them and ordered them to stop.   Although most members of the group followed Canales' commands, two ran away: Liliana Rodriguez Gonzales ("Rodriguez") and Castro.

7.   Rodriguez attempted to evade Canales by heading toward a ridge above the wash, and Castro ran in the bottom of the wash.

8.   Agent Canales was able to catch up to Castro after about 30 seconds.

9.   At this point, the parties' testimony diverges.[2]

<u>Testimony of Agent Canales</u>

Agent Canales testified that when he caught up to Castro, the two heatedly exchanged words, and Castro refused to return to the group despite Canales repeatedly ordering him to do so.   This activity ran contrary to Canales' previous experience, and he noted that undocumented immigrants were generally compliant when he was on his horse. After Castro repeatedly ignored commands to return to the group, Canales whipped Castro with his reins.   Castro then walked toward the group before stopping to look at the ground, an activity Canales interpreted as threatening because the ground was covered with loose rocks.   He yelled at Castro not to think about picking up a rock.   Castro then ran around

---

[2]      The Court notes that the following recitation of testimony is not a finding in favor of either party.   Court findings are preceded by a number.   Any description in a non-numbered paragraph is not a finding of the Court, but rather a description of the testimony during the bench trial.

1

2      the horse and toward Mexico.

3              Canales rode his horse in front of Castro a second time.   Then, Castro reached to

4      the ground and picked up a rock, which was approximately six inches in diameter.

5      Feeling threatened, Canales urged his horse toward Castro, and Castro dropped the rock

6      and moved quickly to the right side of Canales and his horse.   At this point, Canales

7      thought that Castro would resist apprehension.   Castro then bent to the ground a second

8      time.   After picking up a rock, Castro cocked his right arm into a throwing motion and

9      threatened Canales verbally.[3]

10             Canales testified that he felt that he was in immediate danger of serious injury or

11     death and that he had no other choice but to shoot Castro.   So, he aimed his weapon at

12     Castro's center-of-mass and fired one round.

13                                  Testimony of Castro Romo

14             Castro testified that as soon as Agent Canales caught up with him, the Agent told

15     him to "go back, you son-of-a-bitch."   Castro obeyed the Agent's commands, including

16     when Agent Canales told him to keep his head down and keep walking back to the group.

17     Canales also told Castro to "run, run, you son of a bitch.   Run over to where the rest of the

18     people are."   At some point while walking toward the group, Castro told Canales that he

19     needed to stop because his leg was cramping and that he needed to walk slowly to prevent

20     the leg cramps.

21

22             Castro testified that at this point, Canales moved his horse toward Castro and

23     bumped into his back.   Castro protested this treatment and told Canales to stop, which

24     caused Canales to hit Castro with the reins of his horse and respond: "I don't care you son

25     of a bitch.   I'll hit you whenever I want."   Castro responded that if he was hit one more

26     time, he would run toward Mexico.   Canales continued to strike Castro with the reins of

27

28     [3]      According to Canales, Castro told him, "Ahora se va a chingar a tu madre," which
       he interpreted as meaning, "Now you're going to get it, motherfucker."

1

2   his horse, and Castro searched for a place where he would be safe from those strikes.   He

3   continued to run while looking for a place to hide, and he eventually returned to about the

4   same spot where Canales initially caught him on the horse.   There, Castro crouched down

5   to avoid being hit with the reins and felt that he was shot.   After Castro was on the ground,

6   Canales continued circling the area on his horse, ordering Castro not to move.

7                                   The Court's Findings[4]

8        10.   After observing the in-court testimony of Castro and Canales and reviewing

9   the pertinent evidence, the Court finds Castro's testimony about the confrontation and

10  shooting more credible.

11       11.   Canales' description of the event has evolved.

12       12.   The day after the shooting, several government officials interviewed Canales,

13  including two Special Agents with the Federal Bureau of Investigation, a Special Agent

14  with the Department of Homeland Security's Office of the Inspector General, and an

15  Assistant United States Attorney.[5]

16       13.   Canales had a union attorney present during the interview and had an

17  opportunity to speak with him before consenting to the interview, which was primarily to

18  determine whether Castro should be charged with assaulting a federal officer.

19       14.   During the interview, Canales reported that Castro picked up a rock when he

20

21   ───────────────

22   [4]      Rodriguez did not testify at trial; however, the Court did view a video recording of
         her deposition testimony pursuant to Federal Rule of Civil Procedure 32(a)(4).   The
23       Government objected to the use of that deposition, arguing that the witness was not
         unavailable.     That objection is overruled.     The Court does note, however, that
24       Rodriguez's testimony during the deposition revealed that she did not see what happened
         during the critical and disputed moments of the confrontation.   The admission of the
25       deposition, therefore, did not influence the Court's findings.

26
         [5]      During the trial, the parties disagreed over the admissibility of Exhibit 15, an
27       investigative report of the incident prepared by the Border Patrol, which contained this
         interview among other interviews, photographs, and descriptions of the event.   After
28       consideration, the Court admits Exhibit 15 in its entirety.

1

2   was about three feet in front of the horse.   Canales said that he then moved toward Castro,

3   and Castro dropped the rock.   Then, he said that Castro backed up a few steps and bent

4   down again and picked up a rock.   Finally, he said that as Castro rose from a crouch,

5   Canales fired his weapon.

6       15.   The Special Agents conducting the interview focused specifically on what

7   Agent Canales saw when Castro bent to the ground the second time.   Canales stated

8   unequivocally that he did not see Castro pick up a rock and could not even see his hand.

9       16.   Agent Canales was deposed in preparation for this trial.

10      17.   During that deposition, Canales' testimony contains three additions that were

11  not part of the statement made to the Agents conducting the lengthy previous interview.

12      18.   He testified that Castro used threatening and obscene language as he picked up

13  the second rock; that Castro moved quickly to his right side before picking up the second

14  rock (contradicting earlier testimony that he took several steps backwards and away from

15  the horse); and that he waited for Castro to cock his right arm back into a throwing motion

16  before firing his weapon.

17      19.   The Court finds that although much of the additional testimony is not strictly

18  contradictory, it renders Canales' testimony less credible:   Canales was given every

19  opportunity to describe in detail the encounter with Castro – with counsel present – the day

20  after the shooting occurred.   Then, after significant time had passed and in preparation for

21  trial, details of his testimony changed and new details were added.

22      20.   Canales' prior conviction for accepting a bribe as a public official seriously

23  undermines his credibility.

24      21.   Being convicted of any crime for which dishonesty is a factor tends to

25  undermine the reliability of a witness.[6]   In this case, however, the conviction involved

26

27

28
_____
[6]      "There is little dissent from the general proposition that at least some crimes are
relevant to credibility…"   FRE 609, Notes of Advisory Committee on Proposed Rules.

1

2  Canales' work for the Border Patrol.   Specifically, Canales had accepted a bribe from drug

3  smugglers in exchange for allowing them to come through his inspection lane at a border

4  patrol checkpoint.   In addition, while testifying about his criminal conviction, Canales

5  purported not to remember whether he had let other loads cross the border or a checkpoint

6  under his watch before the crossing for which he pleaded guilty.   Canales later testified

7  that he did let other loads through the border or checkpoint, but did not remember whether

8  those were before or after the crossing for which he pleaded guilty.   The close connection

9  between the conviction for accepting a bribe as a public official and the actions in this case

10 – specifically the fact that both actions involve his actions as a Border Patrol Agent and his

11 truthfulness – along with Canales' purported inability to remember the timing of his illegal

12 actions contribute to this Court's finding that Canales' testimony regarding the shooting is

13 not credible.

14       22.   The Court observed Canales and Castro give their testimony on multiple days

15 and over the course of direct-examinations and cross-examinations.   That testimony

16 described the events leading up to and including the shooting, and the Court finds that

17 Castro's demeanor was more convincing than Canales'.

18       23.   The Court finds that Castro was not in the motion of throwing a rock at

19 Canales.

20       24.   The Court finds that Canales did fire the gun and shoot Castro in his lower

21 back/flank area.

22       25.   The Court finds that Canales' firing of his weapon was not based on a

23 reasonable fear for his immediate safety.

24       26.   The Court finds that Castro's injuries were caused by that shooting.

25                                  **Castro's Injuries**

26       The Court heard testimony from two doctors, primarily concerning the extent and

27 permanence of Castro's injuries.

28

1

2
<u>Dr. Salazar Ballardo</u>

3       27.   Dr. Mario Salazar Ballardo ("Dr. Salazar") is a neurosurgeon at the Mexican

4
Institute of Social Security.   He graduated from the medical school at the Autonomous

5
University of Puebla and took additional post-graduate courses to earn his Ph.D. in

6
neurosciences at the Autonomous University of Madrid.   He currently works in private

7
practice in Sonora, Mexico and as a professor at Durango Santander University.

8
        28.   Dr. Salazar began treating Castro approximately four years ago when Castro

9
got a consultation for complications resulting from the gunshot wound.

10
        29.   He testified that Castro presented with pain while standing that got worse if he

11
tried to walk or exert himself.

12
        30.   Dr. Salazar provided care to Castro both at the Social Security Hospital while

13
Castro was receiving public assistance and privately when those benefits were lost.

14
        31.   Dr. Salazar reviewed many documents during the course of the treatment and

15
in preparation for trial, including reports he prepared, reports prepared by his associates in

16
Mexico, and reports from the University Medical Center in Tucson, Arizona where Castro

17
was treated immediately following the gunshot.

18
        32.   Castro's injury resulted from unstable ligaments that attach to the edges of his

19
spinal vertebra.

20
        33.   These ligaments have caused a pseudoarthrosis,[7] which, along with remaining

21
bone and shrapnel fragments, continue to cause Castro pain.

22
        34.   Castro's pain is constant, and it is exacerbated when Castro remains in one

23
position for extended periods of time, when he walks, and when he exerts himself in any

24
manner.

25

26
        35.   Dr. Salazar described the progression of pain symptoms throughout the course

27
[7]      A pseudoarthrosis is commonly known as a "false joint" and occurs when the body

28
is not able to heal bones and/or ligaments after a fracture.   In this case, the torn ligaments
and their non-optimal attachment to the verterbra caused the pseudoarthrosis.

1

2   of his treatment, which started off milder and increased to the point that Castro was not

3   able to maintain employment.

4        Dr. Salazar also testified that surgical treatment for Castro's injuries is necessary,

5   and without such treatment, his pain will continue to progress, causing disability as it

6   expands to both sides of his spinal column.   Without surgery, Castro's medical bills will

7   likely continue to increase as he suffers from more complications and greater pain,

8   requiring more frequent medical visits and more medication.

9        Dr. Salazar additionally testified that Castro should receive surgery on his back that

10  would use titanium instruments to properly separate the joint and provide stabilization.

11  This surgery would relieve some pressure to the spine, although it would not completely

12  alleviate Castro's symptoms.   He would likely continue to suffer some pain, although it

13  should stop increasing.   Castro's work would also continue to be limited, because

14  although he should be able to walk and bend down, he will probably not be able to lift more

15  than approximately twenty pounds.   This surgery would cost approximately $30,000 and

16  require additional hospital stay and medication.

17                          Dr. Ray David Rodriguez Duarte

18        36.   Dr. Ray David Rodriguez Duarte ("Dr. Rodriguez") is a medical doctor who

19  works at the Institute of Social Security in Nogales, Sonora, Mexico.   He completed

20  medical school and earned an additional specialty certificate in psychiatric medicine,

21  which required four years of training after medical school.

22        37.   Dr. Rodriguez performed a psychiatric evaluation of Castro and diagnosed him

23  with post-traumatic stress disorder ("PTSD").   He testified that Castro experiences vivid

24  dreams and nightmares concerning the shooting.

25        38.   Castro rarely leaves the house, and seeing police officers or other law

26  enforcement officials causes him great anxiety.

27        39.   Castro also experiences thoughts of suicide, which is a classic symptom of

28

PTSD.

40.   Castro also suffers from depression.

41.   The combination of these two disorders has negatively impacted Castro's ability to find and maintain employment.

Dr. Rodriguez recommended a course of treatment that includes both medication and psychotherapy.   Determining the appropriate type and amount of medication to treat PTSD and depression is difficult to discover and can take months.   This combined treatment regimen would likely be required for approximately fifteen years.

<u>Dr. Marjorie Eskay-Auerbach</u>

42.   Dr. Marjorie Eskay-Auerbach ("Dr. Eskay-Auerbach") was hired by the government to perform an independent medical examination of Castro in January 2013.

43.   She reviewed documentation that the government made available to her at that time and performed a physical examination of Castro.

44.   She confirmed that Castro did suffer from low back pain and pain in his left leg, likely caused by nerve damage as a result of the shooting.

45.   Her examination revealed that Castro favored his left side, including walking with a limp.   He also reported pain and tingling starting in his left flank and continuing to his left foot.

46.   Castro was able to carry approximately 20 kilograms and reported pain at a level of five or six out of ten, despite being on pain medication.

47.   Dr. Eskay-Auerbach agreed that the gunshot was likely the cause of his injuries and pain.

However, she did not agree that Castro's condition had progressed.  She opined that Castro could have been experiencing greater pain as time progressed, because pain is a subjective experience related to a person's psychic interpretation of physical events.  However, she testified that there was no additional physical damage caused by

1

2     deterioration as a result of the gunshot wound.   Any additional collapse of Castro's spinal

3     column and vertebra were expected as a natural result of aging.[8]

4                                   The Court's Findings

5          48.   Castro's physical and emotional symptoms were caused by the gunshot fired

6     by Canales.

7          49.   Castro's continued progression of symptoms was caused by the gunshot.

8          50.   Dr. Eskay-Auerbach based her contrary opinion on incomplete documents,

9     and the Defendant did not provide her with updated reports of Castro's ongoing treatments

10    and examinations.

11         51.   Dr. Salazar's expert medical opinion is more credible, as it was based on

12    ongoing treatment over several years and a complete record of documents.

13         52.   Castro will need surgery to implant a titanium device to stabilize his spine,

14    ongoing medical care related to the spinal surgery and recovery, ongoing psychiatric

15    treatment (including both in-person visits and medication), and ongoing pain medication to

16    mediate his subjective experience of the pain.

17         53.   The cost of the surgery and accompanying care is approximately $30,000.

18         54.   Castro will require physical therapy several days per week for six months after

19    the surgery.

20         55.   The cost of these sessions is approximately $30 per session.

21         56.   The total cost of the physical therapy is, therefore, $2160.

22         57.   Castro will continue to need medication after the surgery to control his pain

23    symptoms, which will likely never completely abate.

24         58.   The cost of those medications is approximately $450 per month.   Castro will

25    need these medications for approximately 38 years, according to life expectancy tables.

26

27    _____

28    [8]     The Court notes that Defendant provided only a cursory proposed finding of fact
      with respect to Dr. Eskay-Auerbach's testimony, noting that she provided a review of
      Castro's injuries.   Defendant provided no additional proposed findings on the subject.

59.   The total cost of lifetime pain medications is $205,200.

60.   The total cost of treatment for Castro's physical damage is, therefore, approximately $237,360.

61.   Castro will require psychiatric treatment at least once a month for approximately fifteen years.

62.   Each of these sessions will cost approximately $30.

63.   The total cost of psychiatric sessions is approximately $5400.

64.   Castro will also need medication to treat his psychiatric symptoms.

65.   The medication costs approximately $125 per month, and he will likely need the medication for the same fifteen years.

66.   The total cost of his psychiatric medication is approximately $22,500.

67.   The total cost of his psychiatric treatment is, therefore, $27,900.

68.   The Court finds that Castro is entitled to $265,260 for physical and psychiatric treatment.

69.   Castro is unable to find work commensurate with his experience and is likely to be unable to find such work in the future based on the extent of the injury to his spinal column and the residual effects, which are progressive and would continue to deteriorate without appropriate medical intervention.

### Economic Damages

The Court heard testimony from two witnesses with respect to the types of work Castro is able to accomplish and the economic impact of his ability to find such jobs.

70.   Dot Kret ("Kret") visited Castro to determine the extent to which his injuries would hamper his ability to find work.

71.   Kret found that Castro had very few marketable skills, because his injury prevented him from maintaining medium and heavy duty employment, and he did not have an educational background sufficient for most sedentary jobs.

72.   Kret did not think Castro would be able to find significant work without a marked improvement in his physical condition.

73.   The Court finds Kret's testimony to be credible.   In the absence of contrary evidence presented by Defendant, the Court accepts Kret's testimony as true.

74.   The Court also heard testimony from Dr. Dwight Steward ("Steward"), an economist with experience evaluating the past and future income of Mexican citizens.

75.   Steward used a combination of official Mexican documents – including the equivalent of the United States Bureau of Labor statistics – and a review of Castro's personal documentation of his dump truck business to estimate the amount of lost earnings, both past and future.

76.   If Castro continued to work at a similar job as before the shooting, the value of his past earnings (the earnings between the time he was shot and the trial) was $29,207.

77.   If Castro continued to work at a similar job as before the shooting until he turns sixty-five, the present value of those lost earnings (the earnings between the trial and age sixty-five) is $224,136.

78.   Castro performed a significant amount of services to his household.

79.   The value of those lost services is $1252 for the time between the injury and the trial and $12,656 for the time from the trial and extending into the future.

80.   Dr. Salazar expects a 60% improvement in Castro's condition assuming a successful surgery.

81.   The Court will therefore discount the future earnings and household services by that amount.

82.   The Court, therefore, finds that Castro is entitled to $30,459 in past economic damages and $94,717.80 in future economic damages.   In total, the Court finds Castro entitled to $125,176.80 in economic damages.

## **Pain and Suffering**

1

2      The Court recognizes that awarding damages for pain and suffering is an imprecise

3  effort.   However, Arizona law specifically authorizes damages for the "pain, discomfort,

4  suffering, disability, disfigurement, and anxiety already experienced, and reasonably

5  probable to be experienced in the future as a result of the injury."  RAJI (Civil) 5th,

6  Personal Injury Damages 1, Measure of Damages.   After listening to testimony from

7  Castro, his family members, his doctors, and others with whom he has been in contact, the

8  Court finds as follows.

9      83.   Castro's physical pain and suffering amount to $5000 per year.  *See, e.g.*,

10  *Sweeney v. Car/Puter International Corp.*, 521 F.Supp. 276, 287-88 (D.S.C. 1981)

11  (awarding $5000 per year in damages to plaintiff who suffered fractured vertebra,

12  experienced lasting pain requiring medication, and could not engage in sexual intercourse

13  with her husband); *Ward v. La. & Ark. Railway Co.*, 451 So.2d 597, (La.Ct.App. 1984)

14  (upholding a general damages award of $400,000 where a 16-year old plaintiff suffered

15  head and neck injuries resulting in personality change, major back surgeries, chronic pain,

16  and permanent 40% disability); *Tennis v. General Motors Corp.*, 625 S.W.2d 218, 221,

17  229-30 (Mo.App.Ct. 1981) (upholding a damages award for $570,550.67 where the

18  plaintiff suffered dislocation of vertebra and nerve root injuries, which required major

19  surgery, caused lasting pain, and prevented sex with his wife).

20

21      84.   Using the Arizona life expectancy tables, the Court finds that Castro will suffer

22  for 38 more years.

23      85.   Applying a 5% discount rate to the future suffering awards, the Court finds that

24  Castro is entitled to $88,556.44 for pain and suffering.

25      86.   The Court finds that Castro suffered approximately the same amount between

26  the shooting and trial, and, therefore, awards $20,000 for past pain and suffering.

27      87.   Finally, the Court finds that Castro will suffer $2500 annually for loss of

28  companionship and family affection and the loss of enjoyment of life.   RAJI (Civil) 5th,

Personal Injury Damages 1, Measure of Damages.  *See Schindler Elevator Corp. v. Anderson*, 78 S.W.3d 392, 412-13 (Tex. App. 2001) (upholding loss of enjoyment of life damages award for approximately $1.9 million); *Varnell v. La. Tech Univ.*, 98-30,260 (La.App. 2 Cir. 2/25/98); 709 So. 2d 890 (upholding an award including $50,000 for loss of enjoyment of life).

88.   Using the same life expectancy tables and applying the same 5% discount rate, the Court finds that Castro is entitled to $44,278.22 for those losses in the future and $10,000 for those losses between the shooting and trial.

89.   The Court, therefore, finds that Castro is entitled to $162,834.66 for pain and suffering.

## CONCLUSIONS OF LAW

1.   The Court has subject matter jurisdiction over Plaintiff's claims pursuant to the Federal Tort Claims Act ("FTCA").   28 U.S.C. § 1346(b) and §§ 2671, *et seq.*

2.   The FTCA provides that the United States may be held liable for damages caused by the negligent or wrongful act or omission of an employee of the government acting within the scope of his employment under circumstances where the United States, if a private person, would be responsible to the claimant in accordance with the law of the place where the act or omission occurred.   28 U.S.C. § 1346(b); *Valadez-Lopez v. Chertoff*, 656 F.3d 851, 855 (9th Cir. 2011); *Stuart v. United States*, 23 F.3d 1483, 1488 (9th Cir. 1994) (upholding FTCA suit against Border Patrol).

3.   Because the shooting took place in Arizona, the Court applies Arizona law.   28 U.S.C. § 1346(b)(1).

4.   The waiver provided by the FTCA is strictly construed.  *Valadez-Lopez*, 656 F.3d at 855.

5.   A person commits battery under Arizona law if the defendant: (a) intended to

1

2    cause a harm or offensive contact with the plaintiff; (b) the defendant caused a harmful or

3    offensive contact with the plaintiff; and (c) the plaintiff was damaged.   RAJI (Civil) 5th,

4    Intentional Torts 2, Battery.

5            6.   The Court finds that Canales was acting in the scope of his employment with the

6    United States.

7            7.   The Court finds that Canales committed an intentional battery against Castro.

8            8.   Arizona provides that a person who is justified in his use of force will not face

9    civil liability.   A.R.S. § 13-413.

10           9.   A person, including a law enforcement officer, is justified in using deadly force

11   if: (a) a reasonable person would believe that physical force is immediately necessary to

12   protect himself from another's use of unlawful physical force, A.R.S. § 13-404; and (b) a

13   reasonable person would believe that deadly physical force is immediately necessary to

14   protect himself from another's use or attempted use of unlawful deadly physical force,

15   A.R.S § 13-405.  *See also Garcia v. United States*, 826 F.2d 806, 810 (9th Cir. 1987)

16   ("Chapter 4 of the Arizona Criminal Code sets forth conditions under which the use of

17   physical or deadly force against another may be justified.").

18           10.   Canales' use of his firearm constitutes deadly physical force.

19           11.   The use of force was not justified because there was no situation that

20   reasonably provoked such use.[9]   Because the Court finds that Castro's testimony was

21   more credible, there was no attempted throwing of a rock.

22           12.   In the alternative, and even assuming that Canales' testimony was true, his use

23   of force was still not justified under Arizona law.   In order to properly analyze whether

24

25   ─────────────────

26   [9]      The Court notes that Border Patrol Agents regularly interact with dangerous

27   individuals, and many of these interactions take place in remote locations, hours away from
     other Agents.   The Court recognizes that in some of these interactions, use of deadly force
     will be entirely proper.   It is against this background that the Court reaches its

28   conclusions.

Canales was justified in his use of force, the Court looks to the nature of the perceived threat that caused Canales to use deadly force.   The possibility (not probability) of Castro having a rock in his hand – as opposed to a much more lethal weapon, such as a gun – requires a greater level of certainty before deadly force can be justified as reasonable.

Put more bluntly, a rock is not as deadly an object as a gun and requires a greater degree of certainty that the object will be used than the threat or perceived threat of a gun.

13.   The Government spent considerable time attempting to establish that Canales was a "coyote" or guide for persons in the group.   The record on that issue is inconclusive. In any event, the fact that Castro may have been a guide does not change the fact that it was unreasonable for Canales to use deadly force under the facts and circumstances of this case.

14.   At the time Castro was injured, he was not attempting to assault Canales by throwing a rock at him.

15.   Arizona law provides that a

> finder of fact *may* find the defendant not liable if the defendant proves that the claimant was attempting to commit, committing, or immediately fleeing from a felony criminal act and as a result of that act, attempted act, or flight the claimant was at least fifty percent responsible for the accident or event that caused the claimant's harm.

A.R.S. § 12-712 (emphasis added).

16.   The Court does not apply this provision to absolve Defendant from liability for two independent reasons.

17.   First, the Court finds that Plaintiff is not at least fifty percent responsible for his harm.   Despite being in the country illegally, he did not provoke Canales to shoot him.

18.   Second, even if Plaintiff was at least fifty percent responsible for his injuries, the court would not exercise its discretion to bar Castro from recovering.

1

2          19.   The Court finds that the amount of money that will reasonably and

3   fairly compensate Mr. Castro for each of the elements of damages proved by the

4   evidence in this case is $553,270.46.

5          20.   The Court finds that Castro is 10% responsible for his injuries, and

6   Canales is 90% responsible.   The award is, therefore, reduced by 10% to

7   $497,943.41.

8

9          Dated this 5th day of February, 2015.

10

11

12

13                                          _____
14                                          Honorable James A. Soto
                                            United States District Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28